**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

BRIANA SIMS, on behalf of herself and
all others similarly situated,

Plaintiff,

v.

AMERICAN HERITAGE PROTECTIVE
SERVICES, INC.,

Defendant.

No. 24 CV 5620

Judge Georgia N. Alexakis

**MEMORANDUM OPINION AND ORDER**

Briana Sims is suing American Heritage Protective Services, Inc., for alleged

violations of the Fair Labor Standards Act. For a second time, she moves for court-

authorized notice of this lawsuit to other potential plaintiffs who can join her in an

FLSA collective action. For the following reasons, the Court grants Sims's second

motion for court-authorized notice, with modifications, but defers the issuance of

notice in accordance with *Bigger v. Facebook*, 947 F.3d 1043 (7th Cir. 2020), until the

parties submit further materials regarding the employees that American Heritage

contends are bound by arbitration agreements.

## I.      Legal Standards

Employees may bring FLSA claims through a "collective action" on behalf of

themselves and other "similarly situated" employees. 29 U.S.C. § 216(b); *Alvarez v.*

*City of Chicago*, 605 F.3d 445, 448 (7th Cir. 2010). Plaintiffs may only proceed as a

collective if they establish, by a preponderance of the evidence, that they "are, in fact,

similarly situated," at which point the district court will "certify" the collective action. *Richards v. Eli Lilly & Co.*, 149 F.4th 901, 912 (7th Cir. 2025).

But collective actions, unlike class actions brought under Rule 23 of the Federal Rules of Civil Procedure, are "a consolidation of individual cases" where each plaintiff "must affirmatively opt in to join." *Id.* at 906. "[D]istrict courts may," therefore, "issue notice of a pending collective action to 'potential plaintiffs' so that they may make 'informed decisions about whether to participate.' " *Id.* at 906 (quoting *Hoffmann-La Roche Inc. v. Sperlin*, 493 U.S. 165, 169–70, 172–73 (1989)).

"[T]o secure notice, a plaintiff must first make a threshold showing that there is a material factual dispute as to whether the proposed collective is similarly situated." *Id.* at 913. That is, "a plaintiff must produce some evidence"—likely in the form of affidavits—"suggesting that they and the members of the proposed collective are victims of a common unlawful employment practice or policy." *Id.* Courts must also consider a defendant's rebuttal evidence. *Id.*

If, after considering both parties' evidence, the district court determines that the "plaintiff fail[ed] to ... establish[ ] a material factual dispute," it should "deny the motion for notice." *Id.* at 914. If a plaintiff has made the threshold showing, it is left to the court's discretion to determine whether and when notice is appropriate. *See id.* at 913–14. If "the evidence necessary to resolve a similarity dispute is likely in the hands of yet-to-be-noticed plaintiffs," the court may issue notice to the proposed collective and later determine whether to certify the collective. *Id.* at 913.

## II.    Background[1]

Sims previously moved for authorization of notice to a proposed collective comprising "[a]ll former and current full-time, non-exempt security officers … employed by American Heritage Protective Services, Inc. in the United States at any time between three [] years prior to the filing of this lawsuit and the date of final judgment in this matter." [61] at 6 (quoting [34] at 11; [30] ¶ 41). In support of her motion, Sims submitted declarations from herself and four plaintiffs who had already opted in to the collective: Shaunda Ephraim, Tamika Gibson Davis, Matthew Lemerond, and Brittany Sims. [61] at 2 (citing [18]; [25]; [28]); *id.* at 3 (citing [34-2]; [34-3]; [34-4]; [34-5]; [34-6]). The declarations spoke only of the client sites at which the declarants had worked—one in Indiana, [41] ¶ 12, and a handful around Detroit, [40] ¶ 10. In opposition, American Heritage submitted declarations from its head of human resources, Willie Miranda, [40], and its Director of Operations, Rodrick Parker, [41]; copies of two versions of its employee handbook, [42-1]; [42-2]; and deposition testimony from Sims, [42-4], and Lemerond, [42-3].

The Court denied the earlier motion, reasoning that there was no genuine dispute that all members of the proposed collective were subject to a common policy. It noted that American Heritage had produced evidence "that pass-down practices 'vary substantially across client sites,'" [61] at 8 (quoting [41 ¶ 5]), evidence that Sims,

---

[1] The Court assumes familiarity with the procedural and factual history laid out in its opinion denying Sims's first motion for court-authorized notice. *See* [61] at 1–3. In addition, as it did in its earlier opinion, the Court will refer throughout this opinion to plaintiff Briana Sims as "Sims" and to opt-in plaintiff Brittany Sims by her full name.

who only presented evidence pertaining to a handful of client sites, could not rebut, *id.* at 9.

> Sims now moves to authorize notice of a narrower class:

> All current and former full-time, non-exempt security officers (including security supervisors) of American Heritage Protective Services, Inc. who were assigned to the following client sites at any and all times between April 11, 2022 and the present: Logistic Insight Corporation—Clark, MI; Logistic Insight Corporation—Georgia, MI; Logistic Insight Corporation—Plymouth, MI; Logistic Insight Corporation—Harper, MI; Logistic Insight Corporation—Warren, MI; and Sims Metal Management—East Chicago, IN.

[70] at 1. She also moves the Court to toll the statute of limitations for potential opt-in plaintiffs from April 11, 2025 (the date that Sims filed her first motion for conditional certification, [33]) through the date on which notice issues. [70] at 1–2.

## III.   Analysis

The Court first addresses Sims's renewed motion for court-authorized notice and then addresses Sims's motion to toll the statute of limitations. In so doing, it considers all the evidence in the record, including evidence that the parties previously submitted. *Cf.* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record.").

### A.    Court-Authorized Notice

American Heritage objects to the authorization of notice and to certain aspects of Sims's proposed notice plan. The Court addresses each objection in turn.

### 1.    Authorization of Notice

The Court may only authorize notice if Sims has made "a threshold showing that there is a material factual dispute as to whether the proposed collective is similarly situated." *Richards*, 149 F.4th at 913. She has done so here.

The proposed collective is limited to security guards who worked at five client sites in Michigan (Clark, Georgia, Harper, Plymouth, and Warren) and one in Indiana (East Chicago). [70] at 1. Sims has presented declarations from five different security guards, at least one of whom worked at each client site:

- Sims worked for American Heritage from November 2022 until November 2024 at the Clark, Georgia, and Plymouth client sites. [71-2] ¶¶ 1, 9.

- Davis worked for American Heritage from November 2023 until November 2024 at the Clark and Harper client sites. [34-5] ¶¶ 2, 3.

- Ephraim worked for American Heritage from September 2023 until May 2024 at the Georgia, Harper, Plymouth, and Warren client sites. [71-3] ¶¶ 1, 9.

- Britanny Sims worked for American Heritage from January 2023 until October 2024 at the Georgia, Harper, and Plymouth client sites. [71-4] ¶¶ 1, 9.

- Lemerond worked for American Heritage from January 2023 until July 2023 at the East Chicago client site. [41] ¶ 12.

All told, that makes two declarants who worked at the Clark site, three at the Georgia site, three at Harper, three at Plymouth, one at Warren, and one at East Chicago. *See* [71-2] ¶ 9; [34-5] ¶ 3; [71-3] ¶ 9; [71-4] ¶ 9; [41] ¶ 12.

A proposed collective is similarly situated if its members "are victims of a common unlawful employment practice or policy." *Id.* All five declarants say that they performed pass down work outside of their scheduled shifts, [34-2] ¶¶ 4, 6; [34-3]

¶¶ 6, 9; [34-4] ¶¶ 6, 9; [34-5] ¶¶ 6, 9; [34-6] ¶¶ 4, 7; [71-2] ¶¶ 5–7; [71-3] ¶¶ 5–7; [71-4] ¶¶ 5–7; that American Heritage required them to do so, *id.*; and that they were not paid for that pass down work, [34-2] ¶ 7; [34-3] ¶ 10; [34-4] ¶ 10; [34-5] ¶ 10; [34-6] ¶ 8; [71-2] ¶¶ 14, 16; [71-3] ¶¶ 12, 14; [71-4] ¶¶ 12, 14. Four of the five declarants also observed other security guards performing pass down work outside their shifts. [34-2] ¶ 10; [34-3] ¶ 13; [34-4] ¶ 13; [34-5] ¶ 13; [71-2] ¶ 17; [71-3] ¶ 15; [71-4] ¶ 15. In addition, Sims and Lemerond each worked under two different managers and had the same experience under each. [40] ¶ 11; [41] ¶ 12; [42 4] at 158:22–159:5.

The Court previously held that evidence like this amounts "to 'some evidence' of a 'common … practice or policy.'" [61] at 7 (quoting *Richards*, 149 F.4th at 913). It explained that "the officers' experience of being required to perform unpaid pass down work was not limited to a single site, region, or manager," making it "reasonable to infer that plaintiffs' experience was the result of a common practice or policy." *Id.* (cleaned up). The same is true here, but the inference is now even stronger, since the new proposed collective only includes client sites of which the declarants have direct knowledge.

Even so, the Court must consider American Heritage's evidence to determine whether it undermines that inference. *See Richards*, 149 F.4th at 193. The Court denied Sims's previous motion for court-authorized notice because American Heritage presented evidence, in the form of declarations from its vice president of human resources and its director of operations, that pass-down practices varied widely across its 60 client sites. [40] ¶¶ 1, 4; [41] ¶¶ 1, 5–7. American Heritage corroborated those

6

declarations with Sims's own deposition testimony, in which she noted that she did not perform pass-down activities at certain sites. The Court held that American Heritage's evidence "decisively undermine[d]" the "inference that members of the proposed collective"—which included security guards at all sixty client sites—"were subject to a common practice or policy." [61] at 7.

Sims has cured that defect by narrowing the proposed collective to include only security guards from those client sites at which Sims and the other opt-in plaintiffs had been required, according to their testimony, to perform unpaid pass-downs. It is thus no longer of consequence that logistical arrangements at *some* of American Heritage's 60 client sites make pre- and post-shift pass-down activities unnecessary, [41] ¶¶ 5–7. What matters is that there is evidence that security guards at *these* client sites had to perform unpaid pass-down activities outside their scheduled shifts.

To be sure, American Heritage has presented some evidence that pass-down activities may vary even at the six client sites included in the proposed collective. A declaration from Parker, American Heritage's director of operations, states that "the nature and content of [pass-down] activit[ies] var[ies] depending on the … events of the shift," [75] ¶ 5, and "may consist only of a brief transfer of equipment" or may be "more substantive," *id.* ¶¶ 11–12. Thus, "[t]he duration of any exchange [] varies" from "a few seconds" to "longer[,] depending on the circumstances of the shift." *Id.* ¶ 14.

Specifically, Parker attests, at the East Chicago site, the pass-down "did not occur every shift because the client's staffing schedule varies," and, "[g]iven the

nature of the site, officers rarely have information to convey at shift change." *Id.* ¶ 15. Notably, he does not say that no pass-down activities were required in East Chicago or that the officers there were paid for the time spent on those activities. Lemerond's declaration, which states that he performed unpaid pass-down activities at the East Chicago site at the direction of his supervisor, [34-6] ¶¶ 4–9, is therefore sufficient to create a material factual dispute as to whether officers at the East Chicago site were subject to a "common practice or policy" requiring them to perform unpaid pass-down activities. *Richards*, 149 F.4th at 913; *cf. also Craftwood II, Inc. v. Generac Power Sys., Inc.*, 63 F.4th 1121, 1129 (7th Cir. 2023) ("On summary judgment a court cannot weigh conflicting evidence, resolve swearing contests, determine credibility, or ponder which party's version of the facts is most likely to be true.").

Parker asserts similar variances at the Clark, Harper, and Plymouth sites, [75] at 3–4, but, for the same reasons, they fail to overcome the factual dispute created by the declarations of Sims, [71-2], Ephraim, [71-3], Davis, [34-5], and Brittany Sims, [71-4].

Even if the Court were to assume the truth of Parker's declaration—which, again, it may not do at this stage, *Craftwood II, Inc.*, 63 F.4th at 1129—the variances Parker describes go to damages, not to whether members of the proposed collective are similarly situated. The declaration explains that the duration and necessity of pre- and post-shift pass-down activities vary based on circumstances specific to the shift, such as when the shift occurred and what happened during it. *See* [75] ¶¶ 15–19. In other words, Parker asserts varied outcomes attributable to varied

8

circumstances. He does not dispute the existence of a "common practice or policy" requiring officers at the proposed collective's six sites to perform pass-down activities whenever necessary and to do so outside their shifts and without pay. *Richards*, 149 F.4th at 913.

If anything, Parker's statement that "American Heritage … does not permit off-the-clock work," [75] ¶ 26, corroborates the fact that officers are not compensated for pass-down activities performed before or after their scheduled shifts, especially when coupled with the employee handbook's statement that "employees are prohibited from starting work before their regular starting time or continuing to work after their regular stopping time," [42-1] at 15; *see also* [42-2] at 21. This prohibition essentially forces officers into non-compliance in the circumstances described by plaintiffs, where the lack of overlapping shifts means that pass-down activities, which are often a necessary part of the job, must happen outside of at least one officer's scheduled shift. *See, e.g.*, [34-6] ¶¶ 5–6. The evidence of a common practice or policy is thus sufficient to create a material factual dispute as to the similarity of the proposed collective, *Richards*, 149 F.4th at 913. That is true even if application of the common practice or policy sometimes leads to varied results. *See Smith v. Family Video Movie Club, Inc.*, No. 11 C 1773, 2015 WL 1542649, at *6 (N.D. Ill. Mar. 31, 2025) (holding that individual variances resulting from a common policy went to damages, not similarity, because the legality of the policy was "a single, central, common issue of liability").

American Heritage cites two cases that, it says, show that variations like these preclude a finding of similarity, but they don't help. *See* [74] at 9 (citing *Creal v. Group O, Inc.*, 155 F. Supp. 3d 831, 838–40 (N.D. Ill. 2016); *Hannah v. Huntington Nat'l Bank*, No. 18-cv-7564, 2020 WL 2571898, at *7 (N.D. Ill. May 21, 2019)). In *Creal*, the court, after certifying a collective, recognized that the policy at issue was generally compliant with the FLSA except in specific circumstances that depended on facts that were individual to each plaintiff, 155 F. Supp. 3d at 838, meaning that, unlike *Smith*, the legality of the policy was not a "common issue of liability," *Smith*, 2015 WL 154649, at *6. The court decertified the class, reasoning that "there is no efficiency gained by trying all the factual questions and defenses in one trial." *Creal*, 155 F. Supp. 3d at 838. Here, nothing suggests that the legality of refusing to pay officers for pass-down duties that are necessary aspects of their jobs depends on individualized factual inquiries. If that turns out to be the case, American Heritage can move to oppose certification of the collective or move to decertify.

*Hannah*, 2020 WL 2571898, is also unavailing. In that case, the plaintiff moved to conditionally certify a nationwide collective of loan officers, *id.* at *1, but, in support of the motion, he presented only two declarations—from himself, and from someone else who worked in the same office and under the same manager, *id.* at *4. The court denied conditional certification because "[a]llegations that individual supervisors violated the FLSA aren't sufficient for company-wide treatment." *Id.* at *7. Here, unlike the plaintiff in *Hannah*, Sims does not seek a nationwide collective; she seeks a collective comprising officers from six specific client sites. [70] at 1. And, also unlike

10

*Hannah*, she does not offer evidence pertaining only to one specific manager; she offers evidence of a practice or policy that is common across multiple managers at all six client sites. *See supra* at 5–6.

Sims therefore has made "a threshold showing that there is a material factual dispute as to whether the proposed collective is similarly situated," *Richards*, 149 F.4th at 912, so the Court must exercise its discretion to determine whether pre-certification notice is appropriate, *id.* at 913–14. Notice—as opposed to expedited discovery or immediate resolution of the similarity question—is appropriate if "the evidence necessary to resolve a similarity dispute is likely in the hands of yet-to-be-noticed plaintiffs." *Id.* at 913. Here, there is evidence that American Heritage lacks a company-wide policy requiring all of its security officers to perform unpaid pass-down activities. *See* [75] ¶ 25. That means that the testimony of collective members will likely be decisive in determining whether they were in fact subject to a common practice or policy at their specific client sites, making pre-certification notice appropriate.

### 2. Proposed Notice Plan

#### a. Form of Notice

Sims proposes providing notice to potential opt-in plaintiffs by mail and email, [70-1] at 3, and giving them 60 days to respond, [70-6] at 2. She has also submitted a proposed notice document. [70-6]. American Heritage does not object to the method of notice or the 60-day notice period. [74] at 11. But it does ask that the notice itself clearly and prominently state that the Court has taken no position on the merits of the case and that the definition of the proposed collective exclude security officers

11

who signed arbitration agreements with American Heritage. *Id.* The Court agrees with American Heritage that the notice's existing language stating that the Court has not taken any position on the merits (currently located at the end of the notice, [71-6] at 3) should be moved to the first section ("Purpose of this notice") and should be in bold. *See Richards*, 149 F.4th at 910 ("[C]ourts must facilitate notice in such a way as to avoid even the appearance of judicial endorsement of the merits of the action.").

The Court also agrees that the definition of the proposed collective should exclude those employees who are barred from participation in this action by valid and enforceable arbitration agreements. The Seventh Circuit addressed this precise issue in *Bigger*, 947 F.3d 1043, where it held that "a court may not authorize notice to individuals whom the court has been shown entered mutual arbitration agreements waiving their right to join the action." *Id.* at 1050. Under *Bigger*, if the defendant asserts that certain proposed notice recipients should be excluded from the notice group because they entered into mutual arbitration agreements, the court must first determine whether the plaintiff contests the assertion. *Id.* If the plaintiff does not contest the assertion, then the court may not authorize notice to arbitration-bound employees. *Id.* But if the plaintiff *does* contest the assertion, the court must permit the parties to submit evidence on the agreements' existence and validity. *Id.* Under this scenario, if the defendant shows by a preponderance of the evidence that any employee entered into a valid arbitration agreement, the court may not authorize

12

notice to that employee, "unless the record reveals that nothing in the agreement would prohibit that employee from participating in the action." *Id.*

Here, Sims opposes American Heritage's position that employees who signed arbitration agreements should be excluded from the proposed collective, contending that the agreements "are invalid and unenforceable." [76] at 11. The Court must therefore allow the parties to present evidence on whether any employees falling within Sims's proposed collective entered valid arbitration agreements before it authorizes the issuance of notice. As a result, Sims may not issue notice until the Court has resolved the arbitration question.

The Court intends to resolve the issues raised by American Heritage's invocation of the issues addressed in *Bigger* as expeditiously as possible. To that end, the Court directs American Heritage to file, by July 28, 2026, a submission that "establishes by a preponderance of the evidence the existence of a valid arbitration agreement for each employee it seeks to exclude from receiving notice." *Bigger*, 947 F.3d at 1050. Sims has until August 18, 2026, to respond to American Heritage's submission. Any reply should be filed by September 1, 2026. Concurrent with these efforts, American Heritage must prepare for the issuance of notice by compiling the contact information for all persons potentially within the collective group. This way, the notice will be ready to go if and when the Court authorizes the sending of notice.

Ultimately, any notice cannot be sent to employees who entered valid and enforceable arbitration agreements, unless the record reveals that nothing in the agreement prohibits those employees from participating in the action. *Bigger*, 947

13

F.3d at 1050. At this time, the Court modifies Sims's proposed collective definition so that only the following employees would receive notice of this action:

> All current and former full-time, non-exempt security officers (including security supervisors) of American Heritage Protective Services, Inc., <u>excluding those who entered valid and enforceable arbitration agreements with American Heritage,</u> who were assigned to the following client sites at any and all times between April 11, 2022 and the present: Logistic Insight Corporation—Clark, MI; Logistic Insight Corporation—Georgia, MI; Logistic Insight Corporation—Plymouth, MI; Logistic Insight Corporation—Harper, MI; Logistic Insight Corporation—Warren, MI; and Sims Metal Management—East Chicago, IN.

If the Court later determines that nothing in any of the arbitration agreements prohibits the employees from participating in this action, the Court will remove the underlined language.

### b. Discovery

Sims asks the Court to order American Heritage to provide the "name, last known home address … , last known phone number, last known email address, and employment dates" of proposed collective members. [70-1] at 2–3. American Heritage objects to providing the members' telephone numbers, arguing that disclosure is unnecessary because notice is to be by mail and email. [74] at 11. Sims does not respond to this argument or otherwise explain why she needs members' telephone numbers, so the Court declines to order American Heritage to produce them. *See Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument … results in waiver."); *Carrel v. Medpro Grp., Inc.*, No. 1:16-CV-130, 2016 WL 4884157, at *4 (N.D. Ind. Sep. 15, 2016) ("As the Plaintiff has advanced no reason for disclosure of telephone numbers, the Court will not order them to be produced.").

14

### B.     Tolling

Sims asks the Court to toll the statute of limitations for potential opt-in plaintiffs from April 11, 2025 (the date of her first motion for court-authorized notice, [33]) through the date notice is issued. [70] at 1–2. Equitable tolling is appropriate when the plaintiff establishes "that (1) she 'diligently' pursued her claim; and (2) 'some extraordinary circumstances' prevented her from timely filing her complaint." *Blanche v. United States*, 811 F.3d 953, 962 (7th Cir. 2016) (quoting *Credit Suisse Sec. (USA) LLC v. Simmonds*, 566 U.S. 221, 227 (2012)). It "is a rare remedy to be applied in unusual circumstances." *Evans v. United States*, 132 F.4th 473, 479 (7th Cir. 2025) (quoting *Wallace v. Kato*, 549 U.S. 384, 396 (2007)). Even so, "equitable tolling of FLSA claims is a familiar practice" in the Seventh Circuit, and it "is a fair and appropriate measure, especially while disputes about notice are being resolved." *Richards*, 149 F.4th at 914.

This case involves extraordinary circumstances that have delayed resolution of the notice dispute. "[T]hat a court may take months to rule on a fully briefed motion is [] not extraordinary." *Sylvester v. Wintrust Fin. Corp.*, No. 12 C 01899, 2014 WL 10416989, at *2 (Sep. 26, 2024); *see also Perez v. Comcast*, 10 C 1127, 2011 WL 5979769, at *3 (N.D. Ill. Nov. 29, 2011) (collecting cases). But some delays in resolution can be considered extraordinary, either because of the length of the delay, *see, e.g.*, *Bergman v. Kindred Healthcare, Inc.*, 949 F. Supp. 2d 852, 861 (N.D. Ill. 2013) (holding that 24-month delay in ruling on pending motion for conditional certification was an extraordinary circumstance), or because of the reasons for the delay, *see, e.g.*, *Lucas v. JJ's of Macomb, Inc.*, 321 F. Supp. 3d 882, 886 (C.D. Ill. 2018)

15

(holding that injunction of proceedings caused by litigation in another district constituted extraordinary circumstances).

Here, the Seventh Circuit's decision in *Richards*, issued on August 5, 2025, laid out a legal standard for court-authorized notice different from and more demanding than the "modest factual showing" standard previously applied by this Court and many others in this district. *See, e.g.*, *Guevara-Uravac v. Sushi Ukai, Inc.*, No. 24 CV 8728, 2025 WL 919570, at *1 (N.D. Ill. Mar. 26, 2025). As a result, American Heritage asked for leave to file supplemental briefing, [52], which the Court granted, [53]. The supplemental briefing took about one month. [53]. About two months after the completion of supplemental briefing, the Court, applying *Richards*, denied Sims's motion. [60]. It explained that, even though Sims had produced "some evidence" that the members of the proposed collective were similarly situated, the consideration of American Heritage's evidence—consideration required by *Richards*, 149 F.4th at 913, but not by the previous standard, *Guevara-Uravac*, 2025 WL 919570, at *2— decisively undermined the inferences that it otherwise would reasonably have drawn in Sims's favor. [61] at 7. That is to say, Sims would have prevailed on her motion under the previous standard. The *Richards* decision is thus the reason that the parties had to spend an extra month on supplemental briefing and the reason that Sims had to file and await the resolution of this second motion for court-authorized

16

notice. *Richards*, which fundamentally changed the way many district courts in this circuit treat court-authorized notice, was extraordinary.[2]

It is also clear that Sims has diligently pursued her claim. She filed her first motion for court-authorized notice two weeks after filing an amended complaint naming her lead plaintiff and one day after American Heritage answered that complaint. *See* [30]; [32]; [33]. Her subsequent filings have been timely. The Court would be hard pressed to expect more from a litigant. American Heritage disagrees, arguing that Sims's failure to request equitable tolling when she filed her first motion reflects a lack of diligence. But that cannot be, since the extraordinary circumstance that justifies equitable tolling had not yet occurred. Such a request would not have been diligent; it would have been premature.

The Court will therefore toll the statute of limitations for the claims of potential opt-in plaintiffs from April 11, 2025, through the date notice is issued.

## IV. Conclusion

For the foregoing reasons, the Court grants Sims's motion for court-authorized notice [70] with the modifications and limitations explained above, although no notice shall issue until resolution of the arbitration issue addressed in *Bigger*, 947 F.3d 1043. The parties are directed to file submissions on this issue according to the deadlines set forth within the opinion.

---

[2] American Heritage contends that "intervening legal developments do not constitute extraordinary circumstances," [74] at 12, but it cites no legal authority in support. The Court therefore deems that argument waived. *See City of Chicago v. Equte LLC*, 693 F. Supp. 3d 879, 889 n.4 (N.D. Ill. 2023) ("This argument, which is cabined to two brief paragraphs containing no case citations or other legal authority, is so underdeveloped and threadbare that the Court considers it waived.").

The Court previously referred this case to the assigned Magistrate Judge for discovery scheduling and supervision and to conduct a settlement conference, as necessary. [17]. That referral remains open, and the parties are reminded that they have been directed to file a joint status report within 7 days of this ruling. [78].

ENTER:

_____
Georgia N. Alexakis
United States District Judge

Date: July 7, 2026

18